Citation Nr: 1532791 
Decision Date: 07/31/15 Archive Date: 08/05/15

DOCKET NO. 06-29 424 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Manila, the Republic of the Philippines


THE ISSUES

1. Entitlement to an increased rating for migraine headaches, rated as noncompensable prior to September 26, 2005, and 10 percent from September 26, 2005. 

2. Entitlement to an increased rating for status post total knee arthroplasty of the right knee, rated as 30 percent disabling from September 1, 2006, to May 28, 2008, and 60 percent disabling from May 28, 2008. 


ATTORNEY FOR THE BOARD

A.M. Ivory, Counsel


INTRODUCTION

The Veteran had active military service from July 1957 to July 1961 in the Marine Corps and from July to June 1977 in the Air Force. He died on June 21, 2010, and his surviving spouse was subsequently recognized as the substituted appellant in this case pursuant to 38 U.S.C.A. § 5121A (West 2014) (providing for substitution in some cases if the Veteran died, as here, on or after October 10, 2008).

This matter comes before the Board of Veterans' Appeals (Board) on appeal from an August 2005 rating decision issued in September 2005 by the Department of Veterans Affairs (VA) Regional Office (RO) in Manila, Commonwealth of the Philippines. 

The Veteran filed his claim for an increased rating for service-connected migraine headaches on April 5, 2005. In the August 2005 rating decision, the RO continued the Veteran's noncompensable rating for such disability. However, during the pendency of the appeal, in a January 2006 rating decision, the RO granted the Veteran a higher rating of 10 percent, effective September 26, 2005. 

Also in the August 2005 rating decision, RO granted the Veteran an increased rating of 100 percent under 38 C.F.R. § 4.30 based on surgical treatment necessitating convalescence, effective July 2, 2005, for his right knee disability. The RO then assigned a 100 percent rating effective September 1, 2005, and a 30 percent rating effective September 1, 2006. Thereafter, the Veteran disagreed with the assigned 30 percent rating. In a May 2007 rating decision, the RO continued the Veteran's 30 percent disability rating for his status post total knee arthroplasty of the right knee. During the pendency of the appeal, a February 2014 rating decision granted a higher rating of 60 percent for such disability effective May 28, 2008. 

Inasmuch as higher ratings are available for the Veteran's migraine headaches and right knee disability, and an appellant is presumed to seek the maximum available benefit for a disability, the claims for higher ratings have remained viable on appeal. See AB v. Brown, 6 Vet. App. 35, 38 (1993). Additionally, such issues have been characterized as shown on the title page of this decision to reflect the fact that staged ratings are in effect for both disabilities. See Hart v. Mansfield, 21 Vet. App. 505 (2007).

In March 2010, the Board remanded the issue of entitlement to service connection for diabetes mellitus and the issues of entitlement to higher ratings for migraine headaches and residuals of a total right knee arthroplasty. During the pendency of the appeal, a February 2014 rating decision granted service connection for diabetes mellitus. As such was a full grant of the benefit sought on appeal with respect to such issue, it is no longer before the Board. The increased rating claims now return to the Board for final appellate review.

Prior to the Veteran's death, the Veteran was represented by Disabled American Veterans. However, the Veteran's VA Form 21-22 does not transfer to the appellant and she has not submitted a VA-Form 21-22 electing a representative. Therefore, the appellant does not have a representative at this time. 38 C.F.R. §§ 14.630, 14.631 (2014).

In addition to the paper claims file, the Veteran has paperless, electronic files in the Virtual VA claims processing system and the Veterans Benefit Management System (VBMS). A review of those files reveals a December 2013 VA Memorandum in regard to substitution. The remainder of the evidence in such files is either duplicative of evidence included in the paper claims file or is not pertinent to the issues on appeal. 



FINDINGS OF FACT

1. For the appeal period prior to September 26, 2005, the Veteran's service-connected migraine headaches were not manifested by characteristic prostrating attacks averaging one in 2 months over last several months. 

2. For the appeal period as of September 26, 2005, until the Veteran's death on June [redacted], 2010, his service-connected migraine headaches were not manifested by characteristic prostrating attacks occurring on an average once a month over last several months.

3. For the appeal period from September 1, 2006, to May 28, 2008, the Veteran's status post total knee arthroplasty of the right knee was not manifested by chronic residuals consisting of severe, painful motion or weakness in the affected extremity, ankylosis, limitation of extension to 30 degrees or greater, or impairment of the tibia and fibula. 

4. For the appeal period as of May 28, 2008, until the Veteran's death on June [redacted], 2010, his status post total knee arthroplasty of the right knee resulted in chronic and severe residuals that included all manifestations of such disability without implantation of another knee prosthesis.


CONCLUSIONS OF LAW

1. Prior to September 26, 2005, the criteria for a compensable rating for migraine headaches have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.124a, Diagnostic Code 8100 (2014).

2. Since September 26, 2005, the criteria for a rating in excess of 10 percent for migraine headaches have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.124a, Diagnostic Code 8100 (2014).

3. From September 1, 2006, to May 28, 2008, the criteria for a rating in excess of 30 percent for status post total knee arthroplasty of the right knee have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.10, 4.14, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5010-5055 (2014).

4. Since May 28, 2008, the criteria for a rating in excess of 60 percent for status post total knee arthroplasty of the right knee have not been met. 38 U.S.C.A. 
§§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.10, 4.14, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5010-5055 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2014). Proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1). 

In Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), the United States Court of Appeals for Veterans Claims (Court) held that the VCAA notice requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim. Those five elements include: 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. 

In Pelegrini v. Principi, 18 Vet. App. 112 (2004), the Court held that a VCAA notice, as required by 38 U.S.C.A. § 5103(a), must be provided to a claimant before the initial unfavorable agency of original jurisdiction (AOJ) decision on the claim for VA benefits. 

In the instant case, the Board finds that VA has satisfied its duty to notify under the VCAA. As relevant to the claim for an increased rating for migraine headaches, the Veteran was sent letters in May 2005 and June 2005, prior to the initial unfavorable decision issued in September 2005. For the Veteran's claim of entitlement to increased ratings for the service-connected status post total knee arthroplasty, he was sent a letter in August 2005, prior to the initial unfavorable decision issued in September 2005, and January 2007, after the August 2005 rating decision but prior to the continued denial in the May 2007 rating decision. Furthermore, in May 2008 and May 2009 the Veteran was provided with specific information pertaining to the evaluation of such disabilities. In addition, the appellant was sent a letter in July 2012, after she was substituted as the claimant. These letters advised the Veteran and the appellant of the evidence and information necessary to substantiate the increased rating claims, as well as their and VA's respective responsibilities in obtaining such evidence and information. With the exception of the May 2005 and June 2005 letters, the aforementioned letters further informed the Veteran and the appellant of the evidence and information necessary to establish a disability rating and an effective date in accordance with Dingess/Hartman, supra. 

While the January 2007, May 2008, May 2009, and July 2012 letters were issued after the initial rating decision, the United States Court of Appeals for the Federal Circuit has held that VA could cure such a timing problem by readjudicating the Veteran's claim following a compliant VCAA notification letter. Mayfield v. Nicholson, 444 F. 3d 1328, 1333-34 (Fed. Cir. 2006). The Court clarified that the issuance of a statement of the case could constitute a readjudication of the Veteran's claim. See Prickett v. Nicholson, 20 Vet. App. 370 (2006). In the instant case, after such letters were issued, the claims were readjudicated, to include most recently in the February 2014 supplemental statement of the case. Therefore, any defect with respect to the timing of the VCAA notice has been cured. 

Relevant to the duty to assist, the Veteran's post-service VA and private treatment records have been obtained and considered. The Board notes that, in a July 2012 letter, the AOJ contacted the appellant and requested that she identify any private treatment providers that had any potential outstanding records, to include Philippine International Hospital and Dr. Reyes. In response, the appellant did not submit any authorization forms in order for the AOJ to obtain any outstanding private records, but in September 2012 she submitted private treatment records. She also stated that there were no additional records available from Philippine International Hospital since the hospital closed. Therefore, the Board finds that VA has satisfied the duty to assist in this regard. 

The Veteran was also afforded VA examinations in July 2005, August 2005, April 2007, and February 2008 in conjunction with the claims on appeal. The Board finds that the examinations are adequate in order to evaluate the Veteran's service-connected migraine headaches and right knee disability as they include interviews with the Veteran, a review of the record, and full physical examinations, as relevant, addressing the relevant rating criteria. Therefore, the Board finds that the examination reports of record are adequate to adjudicate the increased rating claims on appeal.

As indicated previously, this case was remanded in March 2010 in order for the Veteran to submit or to authorize VA to obtain the records pertaining to treatment of the right knee from the Philippine International Hospital and Dr. Reyes, and to afford the Veteran VA examinations so as to assess the current nature and severity of his migraine headaches and right knee disability. The Board notes that the additional remand directives dealt with the Veteran's claim of entitlement to service connection for diabetes mellitus, which is no longer before the Board. As noted in the February 2014 supplemental statement of the case, additional VA treatment records were obtained and associated with the Veteran's claims file. The AOJ contacted the appellant in July 2012 for authorization forms to obtain records from Dr. Reyes and Philippine International Hospital. The appellant did not submit any authorization forms but in September 2012 she submitted private treatment records and stated that there were no additional records available from Philippine International Hospital since the hospital closed. Additionally, the Veteran was not afforded VA examinations because he died three months after the remand was issued and the VA examinations were not yet scheduled. Therefore, the Board finds that the AOJ has substantially complied with the March 2010 remand directives such that no further action is necessary in this regard. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002).

Thus, the Board finds that VA has fully satisfied the duty to assist. In the circumstances of this case, additional efforts to assist or notify the Veteran and the appellant in accordance with the VCAA would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991) (strict adherence to requirements of the law does not dictate an unquestioning, blind adherence in the face of overwhelming evidence in support of the result in a particular case; such adherence would result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant are to be avoided). VA has satisfied its duty to inform and assist the Veteran and the appellant at every stage in this case, at least insofar as any errors committed were not harmful to the essential fairness of the proceeding. Therefore, she will not be prejudiced as a result of the Board proceeding to the merits of the claims on appeal.

II. Analysis

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities, found in 38 C.F.R., Part 4. The rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. All benefit of the doubt will be resolved in the Veteran's favor. 38 C.F.R. § 4.3. 

In general, all disabilities, including those arising from a single disease entity, are rated separately, and all disability ratings are then combined in accordance with 38 C.F.R. § 4.25. Pyramiding, the evaluation of the same disability, or the same manifestation of a disability, under different diagnostic codes, is to be avoided when rating a Veteran's service-connected disabilities. 38 C.F.R. § 4.14. It is possible for a Veteran to have separate and distinct manifestations from the same injury which would permit rating under several diagnostic codes, however, the critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). 

In order to evaluate the level of disability and any changes in condition, it is necessary to consider the complete medical history of the Veteran's condition. Schafrath v. Derwinski, 1 Vet. App. 589, 594 (1991). Where an increase in the level of a disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). Where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibits symptoms that would warrant different evaluations during the course of the appeal, the assignment of staged ratings is appropriate. See Hart v. Mansfield, 21 Vet. App. 505 (2007).

A. Migraine Headaches

VA received the Veteran's claim for an increased rating for migraine headaches on April 5, 2005. In the August 2005 rating decision, the RO continued the Veteran's noncompensable rating. However, during the pendency of the appeal, in a January 2006 rating decision, the RO granted the Veteran a higher rating of 10 percent effective September 26, 2005. Thus, for the appeal period, the Veteran has a noncompensable rating prior to September 26, 2005, and a 10 percent disability rating since September 26, 2005. 

The Veteran's migraine headaches have been rated under 38 C.F.R. § 4.124a, Diagnostic Code 8100. Migraine headaches with less frequent attacks than the criteria for a 10 percent rating are rated as noncompensable. Migraine headaches with characteristic prostrating attacks averaging one in two months over the last several months are rated at 10 percent. Migraine headaches with characteristic prostrating attacks occurring on an average once a month over last several months are rated at 30 percent. Migraine headaches with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability are rated at 50 percent. 38 C.F.R. § 4.124a.

A November 2004 VA treatment note indicated that the Veteran's migraine headaches were frequent. At a February 2005 routine visit he stated that he currently had a migraine headache but it was not at its worst. It was noted that he had blurring vision. 

The Veteran was afforded a VA examination in July 2005. At such time, it was noted that the Veteran's headaches were on the right side and usually started around the eyes. The pain radiated to the occipital area with nausea and throbbing. Since onset they have been stable. He reported that the medication (Tramadol) he took for his knees also helped his migraines. The headaches were noted to be weekly and not prostrating; ordinary activity was normal. They did not have an effect on occupational activities because he was not employed. For his activities of daily living there was no effect on feeding, bathing, dressing, toileting, and grooming. There was mild effect on traveling and moderate effect on chores, shipping, exercise, sports, and recreation. It was noted that the Veteran claimed the headaches were not as frequent as before but were to two to three times a week. There was no change in character or severity. The VA examiner stated that he could not resolve the issue of severity without resorting to mere speculation because migraine headaches were very subjective. 

In an August 2005 VA treatment note it was suggested that the Veteran get his spectacles corrected in order to alleviate the symptoms of his migraines. In December 2005 it was noted that he had recurrent headaches. A May 2006 VA treatment record reflects complaints of recurrent headaches, one to two times a week, that were relieved by Tylenol. A September 2006 record reflects that the Veteran had recurrent headaches that occurred when he woke up in the morning and such were relieved by Tylenol. In January 2007, the Veteran complained of a headache and it was noted that he had migraine attacks with nausea at times but no dizziness. A January 2008 VA treatment note indicated that he had recurrent migraines and they were persistent that week. That day the severity was 4 out of 10. It was noted that he had blurring vision. In July 2008 he reported recurrent headaches with flashes of light. They were relieved by Tylenol and Tramadol. 

In addition to the above medical evidence, the Veteran stated in September 2005 that in his studies he found that migraines are throbbing or pulsating and were intensified by routine physical activity, coughing, straining, or lowering the head. He also stated that migraines were often so severe that they interfered with daily activity and they may awaken the person. Attacks were so debilitating and once the migraines passed migraine sufferer were often left feeling tired and weak. He also noted that headaches were often unilateral and associated with nausea, vomiting, sleep disruptions, depression, and sensitivity to light, sound, and smells. The Veteran reported that his migraines occurred two to three times a week for the past several months. 

After a careful review of the evidence, the Board finds that, for the appeal period prior to September 26, 2005, the Veteran's migraine headaches do not warrant a compensable rating. In order for the Veteran to warrant a compensable rating prior to September 26, 2005, his migraines headaches must be manifested by characteristic prostrating attacks averaging one in two months over the last several months. However, at the July 2005 VA examination it was specifically noted that his headaches were not prostrating. It was also noted that there was no effect on feeding, bathing, dressing, toileting, and grooming. There was mild effect on traveling and moderate effect on chores, shopping, exercise, sports, and recreation. Furthermore, his headaches were not noted to be prostrating when he sought treatment. In fact, such records only show complaints of recurrent headaches, one to two times a week, that were relieved by Tylenol. Therefore, the Board finds that the objective evidence fails to demonstrate that the Veteran suffered from characteristic prostrating attacks averaging one in two months over the last several months.

In addition, the Board notes that, in his September 2005 statement, the Veteran did not state that his headaches were prostrating but instead described the experience of a typical migraine sufferer that he discovered by doing research. Thus, the Board finds that prior to September 26, 2005, the probative evidence fails to demonstrate that the Veteran's migraine headaches warrant a compensable rating. 

After a careful review of the evidence, the Board finds that, for the appeal period from September 26, 2005, until the Veteran's death on June [redacted], 2010, a rating in excess of 10 percent is not warranted. In order to warrant a 20 percent rating, there needs to be evidence of characteristic prostrating attacks occurring on an average once a month over last several months. In December 2005, January 2007, January 2008, and July 2008 it was noted that the Veteran had recurrent headaches but there was no notation of prostrating attacks or the occurrence of such attacks. Although the Veteran reported, in September 2005, that his migraines occurred two to three times a week for the past several months, he did not state if these were prostrating attacks and the symptoms he described were for the generic migraine sufferer not specifically his symptoms. Thus, the Board finds that since September 26, 2005, there is no evidence that the Veteran's migraine headaches warrant a rating in excess of 10 percent. 

For the entire appeal period, the Board has carefully reviewed and considered the Veteran's statements and the appellant's statements regarding the severity of the Veteran's migraine headaches. The Board acknowledges that the Veteran and appellant, in advancing this appeal, believe that the disability on appeal has been more severe than the assigned disability ratings reflect. Moreover, the Veteran is competent to report observable symptoms. Layno v. Brown, 6 Vet. App. 465 (1994). In this case, however, the competent medical evidence offering detailed specific specialized determinations pertinent to the rating criteria are the most probative evidence with regard to evaluating the pertinent symptoms for the disability on appeal; the medical evidence also largely contemplates the Veteran's descriptions of symptoms. The lay testimony has been considered together with the probative medical evidence clinically evaluating the severity of the pertinent disability symptoms. In addition, the Veteran did not describe his migraine headaches as prostrating prior to September 26, 2005, and he did not describe the severity of the prostrating attacks since September 26, 2005. Thus, the Board finds that based on the Veteran's lay statements he does not warrant an increased rating at any point during the pendency of the appeal. 

B. Status Post Total Knee Arthroplasty of the Right Knee

As noted in the Introduction, the issue on appeal is entitlement to a rating in excess of 30 percent from September 1, 2006, to May 28, 2008, and in excess of 60 percent from May 28, 2008, to June [redacted], 2010, the day of the Veteran's death, for his right knee disability. Throughout the pendency of the appeal, the Veteran's right knee disability was rated under 38 C.F.R. § 4.71a, Diagnostic Code 5010-5055. 

In determining the degree of limitation of motion, the provisions of 38 C.F.R. 
§§ 4.10, 4.40, and 4.45 are for consideration. See DeLuca v. Brown, 8 Vet. App. 202 (1995). 

The basis of disability evaluation is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment. 38 C.F.R. § 4.10. 

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence or deformity of structures or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40. In Mitchell v. Shinseki, 25 Vet. App. 32 (2011), the Court held that, although pain may cause a functional loss, "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Rather, pain may result in functional loss, but only if it limits the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance." Id., quoting 38 C.F.R. § 4.40. 

With respect to joints, in particular, the factors of disability reside in reductions of normal excursion of movements in different planes. Inquiry will be directed to more or less than normal movement, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse. 38 C.F.R. § 4.45. 

The intent of the Rating Schedule is to recognize actually painful, unstable or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. In Burton v. Shinseki, 25 Vet. App. 1, 5 (2011), the Court found that, when 38 C.F.R. § 4.59 is raised by the claimant or reasonably raised by the record, even in non-arthritis contexts, the Board should address its applicability. 

Throughout the pendency of the appeal, the Veteran was rated under Diagnostic Codes 5010-5055. The hyphenated diagnostic code in this case indicates that the service-connected disability is considered to be traumatic arthritis (5010) associated with a residual condition of knee replacement (prosthesis) (5055). See 38 C.F.R. 
§ 4.27.

Under Diagnostic Code 5055, for one year following implantation of knee prosthesis for service-connected knee disability, a 100 percent rating is assigned. Thereafter, a 60 percent rating is assigned when there are chronic residuals consisting of severe painful motion or weakness in the affected extremity; or, a minimum 30 percent rating is assigned. When there are intermediate degrees of residual weakness, pain, or limitation of motion, these intermediate residuals are to be rated by analogy under 38 C.F.R. § 4.71a, Diagnostic Codes 5256, 5261, or 5262. 

Normal range of knee motion is 140 degrees of flexion and zero degrees of extension. 38 C.F.R. § 4.71, Plate II. 

Under Diagnostic Code 5256, knee ankylosis in a favorable angle in full extension, or in slight flexion between zero and 10 degrees warrants a 30 percent rating. Knee ankylosis in flexion between 10 and 20 degrees warrants a 40 percent rating. Knee ankylosis in flexion between 20 and 45 degrees warrants a 50 percent rating. Knee ankylosis in extremely unfavorable, in flexion at an angle of 45 degrees or more warrants a 60 percent rating. 

Diagnostic Code 5261 provides for a zero percent rating where extension of the leg is limited to five degrees. A 10 percent rating requires extension limited to 10 degrees. A 20 percent rating is warranted where extension is limited to 15 degrees. A 30 percent rating may be assigned where the evidence shows extension limited to 20 degrees. For a 40 percent rating, extension must be limited to 30 degrees. And finally, where extension is limited to 45 degrees, a 50 percent rating may be assigned. 

Under Diagnostic Code 5262, malunion of the tibia and fibula with slight knee or ankle disability warrants a 10 percent rating, with moderate knee or ankle disability warrants a 20 percent rating, and with marked knee or ankle disability warrants a 30 percent rating. Nonunion of the tibia and fibula with loose motion, requiring a brace warrants a 40 percent rating. 

As indicated previously, the Veteran was assigned a 100 percent rating for his right knee disability until September 1, 2006, when a 30 percent rating was assigned. In October 2006, the Veteran's private physician stated that the Veteran had a total knee replacement that resulted in a periprosthetic infection and a healed bead removal. He stated that the Veteran was complaining of anteromedial knee pain that may be due to the buildup of fibrous tissue secondary to the surgeries. The Veteran was advised to refrain from strenuous activities or activities that would cause pain, such as prolonged walking and driving. 

In January 2007, the Veteran described knee pain that was aggravated by climbing and descending stairs. The pain was constant and steady. 

At the Veteran's April 2007 VA examination, he complained of occasional, sharp pain over the anterolateral aspect of the right knee, especially when he was driving and at night when he was in bed. He used a cane intermittently for walking. There were no constitutional symptoms of arthritis and there were no incapacitating episodes. His functional limitation on standing was that he could not stand for more than a few minutes and his functional limitation for walking was that he could not walk more than a few yards. He did not have any deformity, instability, weakness, episodes of dislocation or subluxation, or effusion. He had pain, stiffness, locking episodes several times a week, and inflammation manifested by swelling and tenderness. He had moderate flare-ups of joint disease almost every day. His weakness was described as mild. He had a healed scar on the right lateral aspect of the knee as a result of his surgery and a healed scar on the right knee as a residual of a total knee arthroplasty. He had slight swelling of the right knee and tenderness on movement. His gait was antalgic and he had an abnormal shoe wear pattern that showed abnormal weight bearing. His range of motion was 0 to 90 degrees with pain at 80 degrees. After repetitive use his range of motion was to 80 degrees because of pain. He did not have bumps consistent with Osgood-Schlatter disease, crepitation, a mass behind the knee, clicks or snaps, instability, or a meniscus abnormality. He did have grinding and a mild patellar abnormality that was manifested by dislocation/subluxation. An x-ray study revealed no evidence of loosening or osteomyelitis. There was displacement laterally of the right patella. The Veteran was not employed. On his activities of daily living, there were no effects on feeding and dressing; there were mild effects on traveling, bathing, and toileting; and there were moderate effects on chores, shopping, and exercise. He was prevented from sports and recreation. 

In August 2007, the Veteran's private physician stated that he was complaining of anterior knee pain, especially on ambulation, climbing stairs, driving, and activities of daily living. He stated that x-ray studies of the right knee revealed internal dislocation of the patella. He stated that the present knee pain maybe attributed to the patellar maltracking and fibrous tissue build up. 

At a February 2008 VA examination, it was noted that the Veteran complained of occasional sharp pain over the anterolateral aspect of the right knee, especially when he was driving and at night in bed. He used one cane for walking. He did not have any constitutional symptoms of arthritis or any incapacitating episodes of arthritis. His functional limitations on standing were that he could stand for 15 to 30 minutes. His functional limitations for walking were that he was unable to walk more than a few yards. No joint symptoms were noted for the right knee. His range of motion was 0 to 90 degrees with pain at 80 degrees. After repetitive use his range of motion was 0 to 80 degrees because of pain. It was noted that there was no weakness on the right side. He had a healed scar on the right lateral aspect as a residual or surgery. 

The Veteran's private physician stated in June 2008 that he believed the Veteran belonged in the category of "with chronic residuals consisting of severe painful motion or weakness in the affected extremity." He stated that this is because a year ago, i.e., June 2007, the Veteran was complaining of constant aggravating pain and, in August 2007, repeat x-rays showed patellar maltracking. Over the past year, the knee got to the point where the Veteran needed help ambulating. 

In July 2008 it was noted that the Veteran had an arthroscopic retinacular release in May 2008 but the pain persisted. It was stated that the Veteran would be observed for two months to see if he still needed a recommended surgery. Also in July 2008, he was seen for swelling of the knee after repeated bending and prolonged walking. A skyline view of the patella showed a lateral patellar tilt of the right knee with anteromedial tenderness. There were no signs of inflammation. There was no heath, warmth, effusion, or redness. There was a healed, nontender operative scar. His range of motion was 0 degrees to 90 degrees. It was suggested that he undergo a lateral patellar release, an arthroscopic procedure. He was also advised to refrain from strenuous activities. In January 2009 it was stated that the Veteran underwent an arthroscopic retinacula release in May 2008. 

In August 2009 it was noted that a staged revision of the total knee arthroplasty was recommended. There would be two procedures. The first procedure would involve removal of all components of the prosthesis, debridement, irrigation, and application of antibiotic spacers. The second procedure would entail removal of the spacer and definitive revision with a new set of total knee prosthesis. It was noted that the second procedure would be done four weeks after the first procedure. The Veteran stated that if he ever had another procedure he wanted it to be done as an immediate procedure or a one stage procedure. In October 2009 it was noted that the Veteran underwent arthroscopy of the right knee. However, he did not undergo a second total knee replacement prior to his death in June 2010.

The Board has first considered whether the Veteran is entitled to a rating in excess of 30 percent for the appeal period from September 1, 2006, to May 28, 2008, for his service-connected status post total knee arthroplasty of the right knee. The Board notes that the Veteran's 30 percent disability rating is in effect as of September 1, 2006, more than a year after his total knee arthroplasty surgery in compliance with 38 C.F.R. § 4.30 and Diagnostic Code 5055. In order to warrant a rating in excess of 30 percent under Diagnostic Code 5055, there needs to be evidence of chronic residuals consisting of severe painful motion or weakness in the affected extremity. VA treatment reports, VA examination reports, and the private treatment notes indicate that as his knee healed from his July 2005 surgery and his weakness and pain decreased in severity. While he was seen for occasional sharp pain over the anterolateral aspect of the right knee in September 2006, there was no notation of the severity of this pain or weakness. In January 2007, the pain was constant and steady but there was no notation of severity. In addition, it was noted that his knee pain was aggravated by stairs. In April 2007, his weakness was noted to be mild and the pain was described as occasional and sharp; it was also noted that the pain occurred when he drove and at night when he was in bed. In addition, pain did not occur until 80 degrees, and his full range of motion was to 90 degrees. While it was noted in August 2007 that his present knee pain maybe attributed to the patellar maltracking and fibrous tissue build up, there was no notation of the severity of his pain. In February 2008 the Veteran did not have any weakness and pain did not occur during his range of motion until 80 degrees. Thus, the Board finds that, since September 1, 2006, the Veteran's right knee is not manifested by chronic residuals consisting of severe, painful motion or weakness in the affected extremity. 

In reaching such determination, the Board notes that the Veteran's private physician stated in June 2008 that the Veteran warrants a 60 percent disability rating because his symptomatology increased in the past year to the point of chronic residuals consisting of severe painful motion or weakness in the affected extremity. However, the Veteran is in receipt of a 60 percent disability rating at the time of this June 2008 private physician's statement and the Board finds that this statement does not warrant a rating of 60 percent prior to this date as his claims are not supported by the clinical record. Furthermore, the totality of the evidence indicates that, prior to May 28, 2008, his status post total right knee arthroplasty is not manifested by of chronic residuals consisting of severe painful motion or weakness in the affected extremity. Therefore, prior to May 28, 2008, an increased rating in excess of 30 percent is not warranted under Diagnostic Code 5055. 

As indicated previously, when there are intermediate degrees of residual weakness, pain or limitation of motion, the knee is to be rated by analogy to Diagnostic Codes 5256, 5261 or 5262. 38 C.F.R. § 4.71a. Diagnostic Code 5256 applies when there is evidence of ankylosis of the knee; however, the evidence of record clearly reflects that the Veteran does not suffer from ankylosis of the knee as he has been able to maintain significant motion of the knee throughout the appeal period. In addition, since his total knee replacement, his range of motion for extension has been normal (0 degrees). Thus, a higher rating is not warranted under Diagnostic Code 5261. Regarding Diagnostic Code 5262, such pertains to impairment of the tibia and fibula; however, such an impairment has not been alleged or shown in the instant case. Therefore, Diagnostic Codes 5256, 5261, and 5262 are not for application in this case. Thus, prior to May 28, 2008, an increased rating in excess of 30 percent is not warranted under any applicable diagnostic code. 

With regard to giving proper consideration to the effects of pain in assigning a disability rating, as well as the provisions of 38 C.F.R. § 4.45 and the holdings in DeLuca and Mitchell, supra, the reports from the examination and treatment records document consideration of these principles, and there is no indication that increased compensation would be warranted under these principles as such factors do not result in functional loss. In reaching this conclusion, the Board has considered that, while the Veteran had limitations on standing and walking, they have improved since his surgery. In addition, in October 2006 he was advised to only refrain from strenuous activities. In June 2007, it was noted that the Veteran described knee pain that was aggravated by climbing and descending stairs. In April 2007, it was noted that he had moderate flare-ups. It was also noted that he had inflammation, locking, stiffness, and weakness; however, his weakness was mild and, after repetitive use, his range of motion was to 80 degrees. Therefore, while the Veteran experiences pain and swelling, he was still able to function and there is no evidence that such flare-ups result in functional loss/impairment that resulted in greater limitation of motion. Thus, there is no evidence that the Veteran has functional loss which approximates the criteria for a higher rating prior to May 28, 2008. See Mitchell, 25 Vet. App. at 38-43; DeLuca, 8 Vet. App. at 204-7. Therefore, the Board finds that from September 1, 2006, to May 28, 2008, the Veteran's right knee disability does not warrant a rating in excess of 30 percent. 

The Veteran was granted a 60 percent disability rating, effective May 28, 2008, the day of his arthroscopic retinacular release. The Board finds that since May 28, 2008, an increased rating under Diagnostic Code 5055 is not warranted because there is no evidence that he had another prosthesis implanted. Furthermore, such rating contemplates the Veteran's chronic and severe residuals, which included all manifestations of such disability.

In evaluating the Veteran's right knee disability under the criteria of DeLuca, supra, the Board notes that Diagnostic Code 5055 specifically contemplates weakness, pain, and limitation of motion. Therefore, an increased rating is not warranted based on application of 38 C.F.R. § 4.40 and 4.45 and DeLuca, supra.

The Board notes that throughout the pendency of the appeal, it was noted that the Veteran had a scar as a result of his total knee replacement and a scar as a result of his arthroscopic surgery. The rating criteria for 38 C.F.R. § 4.118, Diagnostic Codes 7800 - 7804 were amended effective October 2008; those revisions are applicable to claims for benefits received by the VA on or after October 23, 2008. See 73 Fed. Reg. 54708 (September 23, 2008). In this case, the Veteran's claim was received prior to October 23, 2008, and neither the Veteran nor the appellant have requested reevaluation under the current criteria. Therefore, only the pre-October 2008 version of Diagnostic Codes 7801-7804 are applicable. In September 2005 it was noted that his surgical scar was flat and nontender. In April 2007 it was stated that he had a healed scar on the right lateral aspect of the knee as a result of his surgery and a healed scar on the right knee as a residual of a total knee arthroplasty. In February 2008 it was noted that the Veteran had a healed scar on the right lateral aspect as a residual or surgery. In July 2008 it was stated that there was a healed, nontender operative scar. The Board finds that at no point during the pendency of the appeal does the Veteran warrant a separate, compensable rating for his scar. There is no evidence that the scars are deep or that cause limited motion in an area or areas exceeding 6 square inches (39 sq. cm.) (Diagnostic Code 7801); that they are superficial scars that do not cause limited motion, in an area or areas of 144 square inches (929 sq. cm.) or greater (Diagnostic Code 7802); that they are superficial unstable scars (Diagnostic Code 7803); that they are superficial scars that are painful on examination (Diagnostic Code 7804); or that they limit the function of his knee (Diagnostic Code 7805). Therefore, the Board finds that the Veteran does not warrant a compensable rating for a scar of the right knee at any point during the pendency of the appeal. 

For the entire appeal period, the Board has carefully reviewed and considered the Veteran's and appellant's statements regarding the severity of the Veteran's right knee disability. The Board acknowledges that the Veteran and the appellant, in advancing this appeal, believe that the disability on appeal has been more severe than the assigned disability rating reflects. Moreover, the Veteran is competent to report observable symptoms. Layno v. Brown, 6 Vet. App. 465 (1994). In this case, however, the competent medical evidence offering detailed specific specialized determinations pertinent to the rating criteria are the most probative evidence with regard to evaluating the pertinent symptoms for the disability on appeal; the medical evidence also largely contemplates the Veteran's descriptions of symptoms. The lay testimony has been considered together with the probative medical evidence clinically evaluating the severity of the pertinent disability symptoms. 

C. Other Considerations

The Board has considered whether additional staged ratings for the Veteran's migraine headaches and right knee disability are warranted; however, the Board finds that such disabilities have remained stable during each period on appeal. Therefore, additional staged ratings are not warranted. See Hart, supra.

Additionally, the Board has contemplated whether the case should be referred for extra-schedular consideration. An extra-schedular disability rating is warranted if the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that application of the regular schedular standards would be impracticable. 38 C.F.R. § 3.321(b)(1). 

In Thun v. Peake, 22 Vet. App. 111, 115-16 (2008), the Court explained how the provisions of 38 C.F.R. § 3.321 are applied. Specifically, the Court stated that the determination of whether a claimant is entitled to an extra-schedular rating under 
§ 3.321 is a three-step inquiry. First, it must be determined whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. In this regard, the Court indicated that there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. Under the approach prescribed by VA, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required.

Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as "marked interference with employment" and "frequent periods of hospitalization." Third, when an analysis of the first two steps reveals that the rating schedule is inadequate to evaluate a claimant's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extra-schedular rating. Id.

In the instant case, the Board has carefully compared the level of severity and symptomatology of the Veteran's service-connected migraine headaches and right knee disabilities with the established criteria found in the rating schedule. In this regard, the specific diagnostic criteria adequately addresses the whole of the Veteran's symptoms referable to his migraine headaches and right knee disability as well as the functional impairment resulting from symptoms related to such disabilities. Specifically, with regard to the Veteran's headaches, such include the nature, frequency, severity, and duration of headaches and, with regard to his right knee disability, such include decreased mobility, decreased bending, and difficulty with prolonged standing and sitting. See DeLuca, supra; Mitchell, supra. Therefore, there are no additional symptoms of the Veteran's service-connected migraine headaches and right knee disabilities that are not contemplated by the rating schedule to warrant an extra-schedular rating. 

With specific regard to the Veteran's right knee disability, a wide range of signs and symptoms are contemplated in the applicable rating criteria. Such service-connected disorder requires application of the holding in Deluca, supra, and Mitchell, supra, which, in turn, requires consideration of 38 C.F.R. §§ 4.40 and 4.45. 38 C.F.R. § 4.40 requires consideration of functional loss, including the ability to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance, pain, weakness, and atrophy. Likewise, 38 C.F.R. § 4.45 requires consideration of, in part, incoordination, impaired ability to execute skilled movements, painful motion, swelling, deformity, disuse atrophy, instability of station, disturbance of locomotion, interference with sitting, standing and weight-bearing. Also, 38 C.F.R. § 4.59 requires consideration of such matters as unstable or mal-aligned joints, and crepitation as well as any painful arthritic motion. As such, in the instant case, the Veteran's assigned ratings contemplate his functional loss, to include limited range of motion, as a result of his right knee symptomatology. 

Therefore, the Board finds that the rating criteria reasonably describe the Veteran's disability level and symptomatology associated with his service-connected migraine headaches and right knee disabilities. Furthermore, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extra-schedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the symptoms associated with service-connected disabilities experienced. However, in this case, even after affording the Veteran the benefit of the doubt under Mittleider v. West, 11 Vet. App. 181 (1998), there is no additional impairment that has not been attributed to a specific, rated disability. As such, the Board need not proceed to consider the second factor, viz., whether there are attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating for the service-connected right knee disabilities is not warranted. Thun, supra; Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996).

In Rice v. Shinseki, 22 Vet. App. 447 (2009), the Court held that a claim for a TDIU is part of an increased rating claim when such claim is expressly raised by the Veteran or reasonably raised by the record. In this regard, the Veteran was awarded a TDIU in a January 2001 rating decision, effective September 4, 1999. A review of such rating decision reveals that the TDIU was based upon the Veteran's service-connected heart disability and lower extremity disabilities, which include peripheral vascular disease of the bilateral lower extremities and his right knee disability.

The Court has noted that VA has a "well-established" duty to maximize a claimant's benefits. See Buie v. Shinseki, 24 Vet. App. 242, 250 (2011); AB v. Brown, 6 Vet. App. 35, 38 (1993); see also Bradley v. Peake, 22 Vet. App. 280 (2008). This duty to maximize benefits requires VA to assess all of a claimant's disabilities to determine whether any combination of disabilities establishes entitlement to special monthly compensation (SMC) under 38 U.S.C.A § 1114. See Bradley, 22 Vet. App. 280, 294 (2008) (finding that SMC "benefits are to be accorded when a Veteran becomes eligible without need for a separate claim"). Subsection 1114(s) requires that a disabled Veteran whose disability level is determined by the ratings schedule must have at least one disability that is rated at 100 percent in order to qualify for the special monthly compensation provided by that statute. Under the law, subsection 1114(s) benefits are not available to a Veteran whose 100 percent disability rating is based on multiple disabilities, none of which is rated at 100 percent disabling. For SMC purposes, a TDIU satisfies the requirement of a "service-connected disability rated as total." See Buie at 251; see also Bradley at 293. 

In the instant case, the Veteran has been awarded SMC for the period from July 2, 2005, to August 31, 2006. Additionally, while TDIU has already been established based, in part, on the Veteran's right knee disability, such award does not contemplate his migraine headaches. However, the Board finds that a claim of entitlement to a TDIU based on migraine headaches has not been raised by the Veteran or appellant and is not reasonably raised by the record. In this regard, while the Veteran has been unemployed throughout the appeal period, neither he nor the appellant has alleged that such is a result of his headaches. Furthermore, as previously discussed, the clinical evidence shows that such disability only results in recurrent headaches that are managed by medication. In fact, the VA examiner determined that such resulted in no effect on feeding, bathing, dressing, toileting, and grooming, only a mild effect on traveling, and only a moderate effect on chores, shopping, exercise, sports, and recreation. Therefore, there is no indication that the Veteran's migraine headaches rendered him unemployable during the appeal period. Consequently, the Board finds that a TDIU has not been raised by the Veteran or appellant, or reasonably raised by the record in regard to his migraine headaches. Furthermore, as TDIU was previously established based, in part, on the Veteran's right knee disability, such issue has been rendered moot with regard to his status post total knee arthroplasty of the right knee. Therefore, further consideration of a TDIU is not necessary.

In sum, the Board finds that the preponderance of the evidence is against the appellant's claims for increased ratings for the Veteran's migraine headaches and right knee disability. In denying such ratings, the Board finds the benefit of the doubt doctrine is not applicable. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 4.3, 4.7.


ORDER

An increased rating for migraine headaches, rated as noncompensable prior to September 26, 2005, and 10 percent from September 26, 2005, is denied. 

An increased rating for status post total knee arthroplasty of the right knee, rated as 30 percent disabling from September 1, 2006, to May 28, 2008, and 60 percent disabling from May 28, 2008, is denied. 



____________________________________________
A. JAEGER
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs